Thank you, Your Honor. Good morning. May it please the Court. My name is Leonard Feldman. I'm counsel for the appellant inXco Development Corporation. And with me at counsel table is the company's general counsel, Robert Miller, and my partner, Joel Mullen. Your Honors, the central purpose of the disproportionate forfeiture and temporary impracticability doctrines is to prevent the very sort of termination that occurred here, where a party to a contract terminates the contract based on an immaterial condition precedent, basically a gotcha, after the other party has spent literally millions of dollars in performance based on the expectation of the agreed exchange. In that circumstance, the disproportionate forfeiture and temporary impracticability doctrines excuse the non-occurrence of the condition precedent. Counsel, is there anything in the contract itself which would give the Court some basis for concluding that that provision was not at the heart of the bargain, and not, as you say, a de minimis provision? Your Honor, I assume you're referring to the long-stop date in the requirement to acquire the CSE permit by the long-stop date. If you look at the four corners of the contract, there's nothing specifically in the contract that would suggest that that is not a significant condition to performance. But that's not the question under the law. The question under the law looks beyond the contract, and that's the disproportionate forfeiture doctrine, as well as the temporary impracticability doctrines, which are implied into the contract. We cited the Patch decision for that. But it's part of a larger, I think, body of law that when parties execute a contract, as the parties did here, and in this sense NSP's sophistication, I think, works against it, parties are assumed to know the law. Counsel, let me interrupt you. Several states, I know Arkansas and Missouri, for example, have very clear old cases about conditions precedent, and they even say their materiality does not matter. They do. They're very old cases. Is it true that Minnesota simply has no case that directly addresses the materiality of a condition precedent? Yes, that is true. And if the yes is true, is that they don't have a case that directly addresses that? They do not have a case that directly addresses that. Proceed. But as this Court acknowledged in American Insurance, Minnesota, like many other states, follows the restatement of contracts. And in American Insurance, this Court applied the disproportionate forfeiture doctrine to excuse the nonoccurrence of a condition precedent. And so while Minnesota may not have directly addressed this issue, it has recognized these doctrines. And, of course, in Village of Minneota, the state of Minnesota, also addressed the issue of temporary impracticability. So we know that this is part of the law against which these parties executed this agreement. And there's no question about that. And it's equally clear when you look at the facts that drive these doctrines, they're either favorable to an ex-co, such as the enormous loss that had occurred as a result of termination, or they're facts that have to be resolved in an ex-co's favor on summary judgment. And that, Your Honors, is why NSP has struggled the way it has to try to create rules that it hopes will allow it to terminate based on a gotcha. And as we explain in our briefing, those rules misstate the law. NSP's first proposed rule, which the District Court erroneously accepted, is that the disproportionate forfeiture doctrine doesn't apply to conditions precedent. And, of course, that argument is directly contrary to Section 229 of the Restatement, which states that to the extent the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition. The argument is also contrary to Section 4313 of Williston, which states that the general rule that a party's performance is excused by the non-occurrence of a condition precedent to a party's duty of performance is subject to a significant qualification. And then, of course, it tracks the restatement. And I mentioned American Insurance, where this Court, applying Minnesota law, excused the non-occurrence of a condition precedent because, and I'm quoting, fulfillment of the condition would not have afforded defendants any significant protection. So the relief would be a matter of discretion with the court reviewing the provision. Is that your analysis? It would be a matter of discretion, but it has to be based on an appropriate weighing of the facts and both disproportionate forfeiture and temperance. Well, what would our standard of review be of the discretion exercised by the district court determining whether or not a condition could be excused? Well, the standard of review on summary judgment is de novo, and all facts have to be viewed in the light most favorable to an ex quo. That's the standard of review that applies here. The district court, of course, never got to applying its discretion because it accepted arguments that have no basis in the law, including, as I mentioned, this notion that the disproportionate forfeiture doctrine doesn't apply to conditions precedent. The district court also erred in its analysis of the materiality issue, and that's another rule that NSP has proposed, which is that if you have a contract that expressly permits a party to terminate, then the disproportionate forfeiture doesn't apply, and it uses that to argue that materiality is established as a matter of law, and the district court went down that road. But that argument, as we – I'm sorry, Your Honor, do you have a question? Do I understand now you say Minnesota has no cases that apply disproportionate forfeiture, but are you saying that only in the context of a condition precedent, violation of a condition precedent, or in contract law generally? No, I'm saying in the specific context of a condition precedent. There are cases, Minnesota cases, that we cited. So it applies those factors, but in other aspects of a contract, is that right? Yeah, and I think that's a great question because it highlights one of the distinctions that's really important in this case. There is a law that pertains to covenants of performance, and there's a law that pertains to conditions precedent. And when you look at the law that pertains to covenants of performance, conditions precedent are different. And so rules regarding prejudice and forfeiture, they apply differently in that context. Is there any importance to the fact that in this particular contract, the long stop date is in a different section of the contract than the condition precedent? And would we apply general contract law to the long stop date in its analysis and how it affects the outcome of this contract to the condition precedent, or do we have to read them as a package? Your Honor, we haven't made the argument that the obligation to acquire the CSE permit by the long stop date is anything other than a condition precedent. I think there's a strong argument for the reasons you just identified that it's not a condition precedent.  In terms of disproportionate forfeiture and temporary impracticability, the non-occurrence of the condition precedent is excused. And there is no legal basis to avoid that conclusion. And if I could have just a moment to set up a hypothetical, I think I can demonstrate to you why that's so. Imagine instead of having to deliver a CSE permit by the long stop date, that an EXCO had was to deliver turbines to a dock on or before March 31. And the contract specifically says that that obligation is a condition precedent to NSP's obligation to accept the turbines and pay for the turbines. And the parties chose that date because NSP has resold these turbines to a Japanese company, and there's a ship that's leaving for Japan from that dock. But the ship doesn't leave until May 15. The parties agreed as a condition precedent to the obligation to accept and pay that the turbines had to be delivered by March 31. In those facts, Your Honor, it's not material if because of weather delays, the turbines are delivered on, say, April 15. Nor is there any harm to NSP if the turbines are delivered on those facts by April 15. And it doesn't matter if the parties are sophisticated, and it doesn't matter if NSP determines that it can purchase the same turbines from someone else for less money. And it doesn't matter if NSP refuses to take the turbines so that it doesn't receive something for nothing, which is one of NSP's arguments, and instead it leaves an EXCO with these significantly devalued turbines. That is the law of disproportionate forfeiture. That is the law of temporary impracticability. Now, you're probably familiar with the Williston approach to this, which I think is only if the parties didn't contemplate it do you get to use some doctrine like this. Tell me if you need the sections of Williston, but you've studied this. Right. Why isn't that the right approach? Your Honors, the parties didn't contemplate weather delays. They didn't contemplate a hearing being held in the wrong county. Certainly, if the contract had stated that the parties recognize that hearings can be held in the wrong county, the parties recognize that the government can be delayed by unexpected weather conditions, I think there might be an argument. I'm not sure I would accept it because part of what we're talking about here is can parties contract around equity, and I'm not comfortable with that notion. But if the parties had specifically addressed those risks in this contract, then I think NSP would have a stronger argument, but they didn't address those risks. Instead, they established, and this was an EXCO's proposal and it wasn't negotiated, they established the March 31st date no differently than in the hypothetical I just gave. And the testimony in the record is that as long as construction began in September, an EXCO could meet the December 31st substantial completion date. And that, Your Honors, addresses the issue of materiality and it addresses the issue of harm. And, of course, we're here on summary judgment getting back to the standard of review. We're not requesting that this court decide these issues in EXCO's favor. What we're saying is that there are issues of fact, and those issues of fact have to be resolved by a trier of fact based on the testimony and in a trial setting, not in summary judgment. Those issues of fact involve the hint that I've gathered from your papers that maybe Northern State's power kind of aided and abetted the delay in the long stop date. Yeah, I think probably. Is that one of the issues of fact? It's one of the issues of fact. NSP has claimed. That may also be a matter of the expectancy that Judge Benton mentioned, is it, or not? Yeah, well, it's a bundle of issues. And NSP has certainly claimed that the situation is an EXCO's own doing. An EXCO has an expert witness who has testified that an EXCO did nothing wrong and that it was reasonable for an EXCO to submit the permit application when it did. That's an issue of fact. Has the expert passed the Daubert test? I believe so, Your Honor. And, of course, there's also testimony that the harm is $100 million, as the district court found, or $200 million, as our expert found. And, again, looking at how the district court utilized or employed his discretion, he resolved the facts in NSP's favor. And on summary judgment, that's impermissible. And so we would ask this court to reverse. Thank you. Thank you, counsel. Mr. Weber. Good morning, Your Honors. May it please the Court, Charles Weber for Northern States Power Company. An EXCO sued NSP for breach of contract when NSP did exactly what the party's contract allowed it to do, to terminate the contract if a condition precedent wasn't satisfied, and an EXCO admits that it wasn't, and also, separately, to terminate the contract if the development contract, the first of these two contracts, did not close by the deadline. An EXCO admits that that did not happen as well. You lowered the hammer the very next day after the long stop date was passed. Is that right? We gave the termination notice the day after the long stop date, right. Conditions precedent not satisfied, deal didn't close by the long stop date, and so we terminated. As the contract expressly said that we could do, and not just said we could do it, said that we could do it with no liability to either party. Which was wind power is a lot more expensive than other stuff you were doing, and you didn't have a lot of customers during that economic period of time, or what? You know, Your Honor, there were a lot of reasons why that contract was terminated, but the two that are here today that we're talking about, obviously, are their failure to get the necessary permit. And there's no argument that that permit was just some throwaway, unnecessary thing. It was necessary. They did not get that by the long stop date, and they didn't close on the contract as the contract required. There are a bunch of other reasons, too, that have been left to the wayside as we've worked our way up, just because they might present fact issues. But they don't matter if our termination was rightful as it was based on the terms of the contract under the law. Under Minnesota law, is there any materiality requirement for condition precedent? No. I'm sorry to cut you off. I was anxious to get there. Judge Benton, you asked if there were any cases in Minnesota that talk about the need for materiality with conditions precedent. I'll give you two. There are two cases from the Minnesota Supreme Court, the most recent of which is called Formanic, F-O-R-M-A-N-E-K. These are cited in our materials from 1965, and more importantly, the case that it reaffirms, a case called Hobart against Keough from 1910. And I want to just read a short passage from that because I think it's very important. It's just a very short passage from the Hobart case. This is 126 Northwest 66 at 67. What the Minnesota Supreme Court said in talking about a condition precedent is this, and I quote, it can make no difference in this case whether the stipulated condition is essential or not or whether it is material, for the defendant was under no obligation to enter into any contract with the plaintiff and had the right to name the conditions upon which he would do so. And then the court continued, a right or interest that depends on a condition precedent does not vest until or unless the condition is performed, although it is or becomes for any reason impossible of performance. In that statement. They didn't use the term materiality in your quote, right? They did use the term materiality. Okay. Tell me where it was because I was trying. First of all, is that case in your brief? The Formanic case is, Your Honor. The one you called Hobart that you're reading. Hobart is directly quoted by Formanic. So Formanic has a block quote in it. Okay, great. That incorporates Hobart. And, Your Honor, the beginning of the clause from Hobart, and this is 126 NW, not NW 2nd, but NW at 67, the Minnesota Supreme Court said, and again I quote, it can make no difference in this case whether the stipulated condition is essential or not or whether it is material. But the key words there is in this case. I think in this case, meaning a case that involves a condition precedent, as distinct from a mere contract term, which this court has recognized and the Minnesota Supreme Court has consistently recognized, does have a materiality element. That is, breach of a contract excuses performance on the other side only if the breach term was material. Completely different set of facts, I'm sorry, completely different set of legal rules, as counsel acknowledged, for conditions precedent. Conditions precedent are an exclamation point in the law. They are an exclamation point that the parties put on a provision and say this provision, if it is not satisfied, completely relieves us of the obligation to go forward. The Minnesota Supreme Court has put it very strongly. Failure to satisfy a condition precedent means the contract is added. Was that an option contract, counsel, option contract to buy land in formatting? The formatted case, I believe, yes, it was. Oh, boy, well, option contracts, even in Missouri and Arkansas, have a whole different other set of rules. Yeah, well, but what they were talking about here is an option that was triggered by a condition. So it wasn't just a party's unilateral option. It took it out of the realm of, I understand what Your Honor is saying. It takes it out of just the option contract because the option itself was triggered by a condition, and that condition was that a court in Maine issue an order that allowed the defendant to sell the property. And the court in Maine did not issue that order. And it turns out there was a lot of argument about whether that order was necessary from the court in Maine to transfer the property. The Minnesota Supreme Court said it doesn't matter. When you're dealing with a condition precedent, they are absolute, they are in force. But in those option contracts, time is of the essence as a matter of law almost, isn't it? And that's not, time wasn't really of the essence in this particular case. I would disagree, Your Honor. The parties established a long stop date, March 31, 2011, and listed a whole bunch of things that had to happen by that date. Was that a bargain for a date? You say the parties established it. Sure. As I read the, I thought that that was, came from an ex-co, that there was not any bargaining. Yeah, there wasn't bargained, well, the facts are a little bit in flux on it. It wasn't bargained in the sense that the parties spent a lot of time dickering over it. But it was a bargain term in that an ex-co proposed that date, we agreed to it. But the fact that an ex-co proposed the date is sort of significant. They had it within their control. They were the ones that came up with the date that they wanted to have as the long stop date. And to say, by this date, we will have everything we have to have done, done. And that was their, a date of their choosing. So they can't claim that NSP foisted on them some date that was out of keeping with their plans. Well, they didn't at that time, but when the Blizzards stopped the ability to have the thing and they had it in their own county and so forth, didn't they seek an elongation of the nonstop date and you said no because you really didn't have much of a market for this more expensive electricity at that time? Your Honor, as I said, there were a lot of reasons why we terminated the contract and a lot of reasons why we were not willing to extend the long stop date that are not on the record here simply because we litigated this case along the lines that are up here. But to answer Your Honor's question. There are ignorable misabilities here. Well, and Your Honor, I mean, it can't be overlooked the fact that an ex-co asked the North Dakota Public Service Commission to waive the one-year waiting period for them to apply for this permit, which the Public Service Commission did and allowed them to apply as early as January of 2009. Why they waited almost two more years to submit the application is the. . . They were being hassled by the Hooping Crane Trust, weren't they? Well, I. . . Which is headquartered down in Nebraska, by the way. Is that right? Okay. Your Honor, that may have been an issue, but there was no testimony in this record that it was impossible for them to submit their application. Well, there hasn't been any record. No, no, no. Oh, no. But there was a record in front of the district court after full discovery on what happened in the lead-up to the application for certificate. And what an ex-co is ignoring is impracticability isn't just, gee, given our decision to apply at the last minute, did anybody anticipate a snowstorm in North Dakota in December? Did anybody anticipate the hearing being held in the wrong county? That's the wrong question. The question was, was it impossible for them to have applied earlier to get that permit on time? They've never put in any evidence that suggests otherwise on that. So they're looking at the impracticability question ex post. Given the fact that we waited until October to file, could you foresee a snowstorm? Not the right question. The right question is, was it impossible for them to get this permit by the long stop date? And there was no evidence that they couldn't have done it before then. Now, Minnesota law, what an ex-co is asking for in this case, basically, is for this court to change Minnesota law for it. Minnesota law has never adopted a position that says that forfeiture can overcome an express condition preceding and an express termination clause. And it bears reminding that we have both here. This isn't just a contractual condition preceding that wasn't satisfied and we terminated. We've also got an express termination clause in the contract that backs up the condition preceding and says, if a condition preceding isn't satisfied, we want to be very clear. Either party can terminate this contract and can do so without liability. That's at page 529 of an ex-co's appendix. That's the relevant provision of the contract they're dealing with here. So the parties did a belt and suspenders approach here to emphasize, to emphasize that if they did not satisfy the conditions preceding by that March 31st, 2011 date, this contract could be terminated. And importantly, neither party would have any liability from doing so. An ex-co's argument in this case would make commercial contracts unpredictable. And more unpredictable, the bigger dollars were involved in the contract. An ex-co's argument here is, well, gee, this contract had so much money at stake, it worked such a forfeiture to have it terminated that an SP shouldn't have done it and now should be liable retroactively for exercising its contract rights. A proposition that the predictability of a commercial contract decreases the bigger the contract is and the more sophisticated the parties is completely upside down. Now, a lot of people didn't predict the 2006-2008 turndown. Sure. And that's commercial risk that parties take all the time, and that's exactly what we bargained for in this case. The parties agreed that an ex-co would bear the burden of getting that permit by the long stop date, and if it didn't do it, that the parties could terminate the contract. Conditions preceding are kind of strict liability in that sense. If they're not met, the contract stops. And it doesn't matter whether they were morally blameworthy or not for doing it. The contract comes to an end. Now, I want to visit the forfeiture point for a moment here because the district court's main rationale on rejecting the forfeiture argument and a rationale that does not require us to get into whether Minnesota should adopt Section 229 of the Restatement or not and whether Section 229 of the Restatement says what they say it says, there's an as-seen issue. Was there a forfeiture at all? The district court's main rationale was that on the undisputed facts of this case, there was no forfeiture for this reason. When we terminated the contract, an ex-co walked away with all of the turbines that it bought, and it retains the Merricourt Project itself. NSP walked away with nothing. We terminated the contract. We have no rights in the project. We have no turbines. It is also undisputed that after the termination, an ex-co took all those turbines that it bought, moved them to Texas, and is using them in a project that they concede is profitable. Your Honors, the $100 million, the $200 million figures that they are throwing around are not actual out-of-pocket losses. They are lost profits. They are operating these turbines at a profitable project in Texas. It's just not making as much profit as a book matter as they hope to at Merricourt. I'm aware of no authority anywhere, and certainly not in Minnesota, that says that a loss of profits or lower profits than you had wanted constitutes a forfeiture. Is that all in the record that's before us here? It is, Your Honor. And the fact that the damage calculation that is being engaged in is based on a liquidated damages provision in the party's second contract, the contract that we have called the construction contract. That is in the sealed appendix, Your Honor. Their expert witness, the one that they keep pointing to, says in his expert report that he is doing a calculation of damages according to the formula that was set forth in the party's contract. That is a liquidated damages provision. That's at page 144 of the sealed appendix. So he's not doing an out-of-pocket analysis. He is doing an analysis of a contract liquidated damages provision. And he is saying that under that liquidated damages provision, which doesn't bear a relationship to the actual damages, he's calculating that loss. Well, liquidated damages provisions quite often impose forfeitures. Quite often courts refuse to enforce liquidated damages provisions precisely because they lead to a forfeiture. And that's exactly what Anexco is asking for here, Your Honors. On their analysis, NSP should have to write a check for $100 million, $200 million, and get nothing. Anexco continues to use the turbines profitably in Texas. They continue to have the AmeriCorps project. And NSP gets nothing but having to write a nine-figure check. That imposes a forfeiture. So if they are correct, as Maxim always says, the law abhors a forfeiture, that's a strong suggestion that the court should not and cannot adopt their position. That was the primary rationale of the district court, is that it was undisputed on all of the evidence in the record that there simply was no forfeiture. Now, once you get beyond that, it triggers the cases that I've talked about in Minnesota that say that forfeiture is not an element when you're dealing with the condition preceding. They are special. They are powerful. And they are enforced in Minnesota precisely because we want parties to be able to rely on them. But along this same line, NSP also has the benefit of not having to pay for this expensive electricity that's produced by wind power. No, Your Honor, because what we would do is we would be essentially operating the project and we would be getting the benefit of that electricity. But we certainly have not avoided a loss. Which, when compared with the other ways of generating it that are in existence, is somewhat elevated, right? It is somewhat elevated, but also it's important. Like 20% or something like that? I don't know what the figures are, Your Honor, but what's important to remember is that the Public Service Commission, both Minnesota and North Dakota, approved this project and allowed NSP to be able to recover the cost of the project from its rate payers. So NSP would not face a loss. It would be able to recover that from the rate payers if it had gone forward with the contract. So we've got an unusual situation where it was actually NSP had already gotten approval to operate this project and to make a profit doing it, but terminated it nonetheless because of all the other concerns. Within the context of your whole operation? Within the context of the whole operation, but I think it's important to realize that this wasn't an NSP walking away from a loss. And there's also no cases that say that walking away from a loss imposes a forfeiture on the other side. The other side has to suffer a forfeiture, and as we pointed out, there simply was no forfeiture here. They retain everything that they have, and we have nothing. I see my time is up. I thank you. I thank you, Your Honors. Thank you, Mr. Weber. Mr. Feldman, you may conclude your argument. Thank you, Your Honors. Just very briefly, I want to address the materiality issue and the forfeiture issue. Mr. Weber relied heavily on the Foreman Tech decision. As we pointed out in our briefing, there's absolutely no discussion in that decision about the restatement, Section 229, 269, and 271. It's a decision that is old law, and it does not address the specific legal doctrines that are at issue in this case. The case that does address those doctrines, of course, is this Court's more recent decision in American Insurance, which acknowledges that applying Minnesota law, courts do employ the forfeiture doctrine. And if there's any question about that, I would submit that the way to resolve it is to certify that particular issue to the Minnesota Supreme Court. On the issue of forfeiture, what Mr. Weber has done is continue to argue the facts that, on summary judgment, must be viewed in the light most favorable to an ex co. The losses that were incurred on these turbines, and we explained this in our reply brief, they are very specific turbines. They became obsolete during the course of this project. An ex co. was under an obligation to mitigate its damages. That's why these turbines are now in Texas. The losses that NSP itself calculated were $100 million. And, of course, the president of NSP knew that at the time that he terminated based on a gotcha. And if we're going to talk about policy arguments, we are not asking this Court to undo Minnesota law. We are asking this Court to apply the disproportionate forfeiture and temporary impracticability doctrines, which are narrow exceptions to conditions perceived just as courts throughout this country have. And as to the issues of protecting NSP, well, that's why there's a termination for convenience provision. Sophisticated companies like NSP, if they want to terminate for purely financial reasons, which is what happened here, they terminate for convenience and they pay the damages that are set out in the contract. What they don't do and what they cannot do is use an immaterial condition precedent as a pretext for economic breach. We ask this Court to reverse and remand. Thank you. Thank you, Mr. Feldman. Court wishes to thank both counsel for your presence and argument this morning. Very interesting case. We will take it under submission and render a decision in due course. Thank you.